***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Young, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 18 July 2001 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the plaintiff-employee and defendant-employer at all relevant times herein.
3. Electric Insurance Company was the carrier on the risk at all times relevant herein.
4. The parties stipulated that the plaintiff's average weekly wage was sufficient to give rise to the maximum compensation rate for 1994.
5. The parties stipulated to plaintiff's medical records from Atlantic Orthopaedics, P.A., Coastal Orthopaedics, Southeastern Orthopaedic Clinic, Wilmington Health Associates, P.A., Wilmington Physical Therapy, Wilmington Hand Rehabilitation Center, New Hanover Regional Medical Center/Rehabilitation, Columbia Cape Fear Memorial Hospital, Carolina Arthritis Associates, University of North Carolina Hospitals, Wilmington Orthopaedic Group, P.A., Wilmington Plastic Surgery Specialists, P.A., Brafford Chiropractic, Carolina Sports Medicine, Dr. James Pawlowski, New Hanover Regional Medical Center/Radiology, New Hanover Regional Medical Center/The Oaks, General Electric Employee Health Individual Encounters Summary, and General Electric Employee Health/Medical Case Records.
6. The issues presented are:
 a) Whether any of plaintiff's several medical conditions, both physical and mental, are occupational diseases under the North Carolina Workers' Compensation Act?
 b) Whether the plaintiff is entitled to any benefits under the North Carolina Workers' Compensation Act?
 ***********
Based upon all the evidence adduced from the record, the undersigned makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff-employee was 53 years old.
2. The plaintiff-employee began working for the defendant-employer in July 1974. Initially, the plaintiff-employee worked as an inspector. In 1985, the plaintiff-employee was promoted to Quality Inspector B and then to Quality Inspector A in 1994. The jobs are similar. The Quality Inspector A job is slightly more supervisory.
3. As a Quality Inspector, the plaintiff-employee's responsibilities were varied, but included working in the B4C Rod area where she would handle 20 pound bundles of control rod components in sublots of 24 rods each with each weighing less than one pound. There were three sublots per lot and the plaintiff-employee testified that she would inspect as many as five to six lots per day. The plaintiff-employee used gauges and other measuring devices to inspect and would typically only inspect a portion of the 24 rod sublots completely and then "eyeball" the remaining rods to make sure that there were no obvious mistakes if the first several were 100% accurate. The plaintiff-employee described having to work at a long table with four shelves beginning 12 inches above table level requiring her to lift overhead for the third and fourth shelves. The plaintiff-employee would remove sublots from these shelves, take them apart and inspect the rods then take them by sublot carrying them over to a cart for weighing.
4. Aside from the B4C Rod area, the plaintiff-employee also worked in the tie plate room and the marathon area. Depending on production needs, the plaintiff-employee performed many varied tasks. On some occasions when production is required, the plaintiff-employee would be asked to perform completely different work in other areas of the plant. The plaintiff-employee did not perform any one task all day, everyday and rarely would perform any task all day at all. Some days when the plaintiff-employee would not do some of the tasks that she described again depending on production needs. Finally, the plaintiff-employee was responsible for entering information in the computer at least one hour per day during each day so that her job duties were further varied.
5. At the hearing, the plaintiff-employee recalled that she was initially seen by Dr. Esposito for left thumb problems in May 1993. By July 2, 1993, the diagnosis was left trigger thumb and on that date Dr. Esposito performed a trigger thumb release. The plaintiff-employee was out of work from July 2, 1993 to July 8, 1993 and received $257.14 in fully employer-funded short-term disability benefits during this period.
6. Dr. Pruett, a rheumatologist, examined the plaintiff-employee on November 4, 1994. The plaintiff-employee's complaints included pain in her right hand for about three months located on the palmar side of her thumb and outside the index finger, pain in her left hand associated with tingling over the outside fingers, burning over her wrists, and discomfort on the left side of her neck with intermittent pain in her neck, low back and feet. Dr. Pruett noted that the plaintiff-employee related to him that her job required heavy lifting and use of her hands and indicated he suspected her symptoms may be "occupational related, due to heavy lifting with this region of her hand, as well as possible tendonitis."
7. Since November 1994, several doctors have treated the plaintiff-employee for a variety of problems with regard to her hands. On January 31, 1997, the plaintiff-employee underwent a right carpal tunnel release and right ring finger trigger release. The plaintiff-employee was out of work from January 31, 1997 until March 2, 1997, during which time she received $1,550.00 in fully employer-funded short-term disability benefits.
8. On February 18, 1998, the plaintiff-employee underwent a left ring trigger finger release by Dr. Nicks. The plaintiff-employee was out of work from February 18, 1998 until March 10, 1998, during which time she received $1,200.00 in fully employer funded short-term disability benefits.
9. On June 4, 1999, Dr. Bynum performed a left wrist release first flexor compartment and removal of a retinacular cyst, left wrist by Dr. Bynum. The plaintiff-employee was out of work from June 4, 1999 until June 23, 1999, during which time she received $1,055.44 in fully employer-funded short-term disability benefits.
10. Finally, on May 16, 2000, the plaintiff-employee underwent a second procedure by Dr. Bynum, a left middle finger trigger release by Dr. Bynum. The plaintiff-employee was out of work from May 16, 2000 until June 11, 2000, during which time she received $1,181.48 in fully employer-funded short-term disability benefits.
11. In November 2000, due to a reduction-in-force, the plaintiff-employee began working as a machine operator in the aircraft engine division and was so employed at the time of the hearing.
12. On January 20, 2001, the plaintiff-employee was hospitalized due to psychological problems, including depression with suicidal ideations. She was also hospitalized for a relapse on April 6, 2001. In both her medical records and in testimony at the hearing, the plaintiff-employee ascribed her primary stressor leading to her "breakdown" as her inability to physically and mentally cope with the switch to the third shift job.
13. As a result of her psychological hospitalizations, the plaintiff-employee was out of work from January 20, 2001 to March 31, 2001 and from April 6, 2001 until May 4, 2001. The plaintiff-employee was working in her machine operator position on the date of the hearing.
14. Dr. Nicks, a plastic surgeon, opined that the left ring trigger finger condition that he was treating the plaintiff-employee for was usually caused by diabetes, arthritis or was simply idiopathic. Although Dr. Nicks did not review the job videotape, Dr. Nicks testified that he did not have an opinion as to the cause of the plaintiff-employee's trigger finger, but noted that repetitive motion was not "specifically listed as a causative agent in the literature" regarding trigger fingers. Dr. Nicks also did not testify that the plaintiff-employee's carpal tunnel syndrome or any other problem was caused by her job with the defendant-employer. Finally, Dr. Nicks did not testify that the plaintiff-employee's job caused any of her problems or placed her at an increased risk of developing any of her other problems.
15. Dr. Parent, an orthopaedic surgeon and hand specialist, saw the plaintiff-employee on two occasions in 1996 and 1998. After reviewing the job videotape, Dr. Parent opined that the plaintiff-employee's job was not the type of job to cause carpal tunnel syndrome, de Quervains or trigger finger and further opined that he did not know what caused her conditions.
16. Dr. Bynum, an orthopaedic surgeon and hand specialist, began treating the plaintiff-employee in February 1999. He ultimately diagnosed left de Quervain's tendonitis and left middle trigger finger. He performed surgery on both conditions. As to the cause of these conditions, Dr. Bynum testified that he did not believe the plaintiff-employee's job caused the carpal tunnel, de Quervain's or trigger digits. After reviewing the job videotape entered into evidence, Dr. Bynum did not believe the Quality Inspector position was a "repetitive motion job" and did not place the plaintiff-employee at an increased risk of developing her conditions than that of the general public.
17. Dr. Markworth, an orthopaedic surgeon, testified that repetitive use could aggravate the plaintiff-employee's de Quervain's tendonitis and opined, based upon a hypothetical question by the plaintiff-employee's counsel, that her job duties did aggravate the conditions in the plaintiff-employee's case. However, Dr. Markworth did not review the job videotape and acknowledged that the information he had about the plaintiff-employee's "repetitive job" was based solely upon the plaintiff-employee's history and the hypothetical information given at this deposition. Furthermore, he did not testify that the plaintiff-employee's job placed her in any increased risk of being diagnosed with these conditions.
18. After careful review of the evidence of record, including records of Dr. Esposito, as well as, the other expert testimony provided in relation to this case, the undersigned gives greater weight to the opinions of Dr. Nicks, Dr. Parent and Dr. Bynum than to the opinions of Dr. Markworth.
19. Based upon the competent evidence in the record, the plaintiff-employee's Quality Inspector positions did not cause or significantly contribute to the development of her carpal tunnel syndrome, de Quervain's tendonitis, trigger thumb and finger.
20. Based upon the competent evidence in the record, the Quality Inspector position did not create a greater risk of developing carpal tunnel syndrome, de Quervain's tendonitis, or trigger thumb and finger than the general public not so exposed.
21. The competent evidence in the record fails to establish that the plaintiff-employee's depressive condition was caused or significantly contributed to by her Quality Inspector position or that this position placed her at an increased risk of developing this condition versus the general public.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following
 CONCLUSIONS OF LAW
1. The greater weight of the evidence fails to show that any of the plaintiff's physical or mental conditions requiring medical treatment were related to causes or conditions which are characteristic of and peculiar to her employment with the defendant-employer. N.C. GEN. STAT. §97-53(13); Perry v. Burlington Indus., Inc., 80 N.C. App. 650,343 S.E.2d 215 (1986); Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85
(1983); Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980).
2. Plaintiff is therefore not entitled to any compensation under the provisions of the North Carolina Workers' Compensation Act.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Plaintiff's claim for workers' compensation benefits is, and under the law must be DENIED.
2. Each side shall pay its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER